UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MAINE

| | |
|---|---|
| ACA CONNECTS – AMERICA'S COMMUNICATIONS ASSOCIATION, *et al.*,<br><br>    Plaintiffs<br><br>        v.<br><br>AARON FREY, in His Official Capacity as the Attorney General of the State of Maine,<br><br>    Defendant. | CIVIL ACTION NO.: 1:20-cv-00055-LEW |

**DECLARATION OF DR. JONATHAN R. MAYER**

I, Dr. Jonathan R. Mayer, declare as follows:

INTRODUCTION

1. I am an Assistant Professor at Princeton University, where I hold appointments in the Department of Computer Science and the Woodrow Wilson School of Public and International Affairs. My areas of research and teaching include both networking and data privacy. I hold a Ph.D. in Computer Science from Stanford University and a J.D. from Stanford Law School.

2. Prior to joining the Princeton faculty, from 2015 to 2017, I served as the Chief Technologist of the Federal Communications Commission (FCC) Enforcement Bureau. In that role, I was substantially involved with the FCC's 2016 broadband consumer privacy rulemaking. The technical and regulatory considerations that were foundational for the FCC's proceeding are relevant to understanding and evaluating L.D. 946.

3. I submit this declaration at the request of the Office of the Maine Attorney General, because this litigation involves technical and regulatory considerations at the intersection of

1

computer networking and data privacy. My aim is to provide additional background and context that may benefit the Court in considering the Plaintiffs' Motion for Judgment on the Pleadings.

<u>INTERNET SERVICE PROVIDER ACCESS TO CONSUMER DATA</u>

4.  Internet service providers ("ISPs") are essential onramps to the internet. Whenever a consumer uses an online service—such as reading a webpage, watching a video, or playing a game—an ISP necessarily handles that consumer's data.

5.  There are two common types of consumer ISPs: residential and mobile providers. Residential providers offer connectivity to households, typically over fiber-optic cable (e.g., Verizon FiOS), coaxial cable (e.g., Comcast Xfinity), or copper telephone lines (e.g., AT&T DSL). Mobile providers typically offer service via radio communications (e.g., T-Mobile LTE), connecting smartphones and similar devices to a network of cellular towers.

6.  There are also, broadly, two categories of information that ISPs obtain from consumers: subscription information and network usage data.

7.  Subscription information is information that an ISP obtains by virtue of a consumer signing up for and maintaining an account. ISPs typically have access to a consumer's name, billing address, mailing address, service address (for residential service), telephone number, email address, social security number and birthdate (when service is postpaid), payment method, and payment history.

8.  Network usage data is information that an ISP has access to by virtue of providing internet connectivity to consumers. This category of information includes the timing and volume of data transmitted over the ISP's network, usually the identities of the online services that a consumer interacts with, and in some instances the content of the consumer's communications.

9. For example, suppose a consumer loads the COVID-19 resource page on the Cumberland County website. The consumer's ISP will contemporaneously observe network traffic to and from the server that provides the Cumberland County website (with the network address "208.90.189.82" and domain name "cumberlandcounty.org"). Because the Cumberland County website directs the consumer's device to load the webpage via an unencrypted connection, the ISP will also observe the full webpage URL ("http://cumberlandcounty.org/720/COVID-19") and the content of the webpage.

10. The consumer activities that generate network usage data are not limited to web browsing. An ISP can also typically observe information about the applications that a consumer uses, including desktop applications (e.g., using Spotify to listen to music) and mobile apps (e.g., using Uber to call a ride). Residential providers can also usually observe information about the "internet of things" connected devices that consumers use (e.g., smart lights and thermostats).

11. Mobile providers additionally have access to consumer geolocation data over time. The frequency and precision of this data varies. When a consumer's location is derived from the Global Positioning System or nearby Wi-Fi networks, or when the consumer is near a cellular antenna with limited coverage, the location information available to a carrier can be accurate within feet.

12. Network usage data can also include configuration information about the consumer's devices, such as the manufacturer, model, and unique serial numbers. This type of information can enable an ISP to associate multiple devices with a particular consumer.

13. ISPs have the ability to link each of the types of information I have described. For example, an ISP could connect a consumer's geolocation data with their web browsing data to determine where the consumer was located when they visited a specific website.

14. ISPs are also able to link the types of information I have described to offline information. For example, an ISP could use a consumer's subscription information to acquire a profile about the consumer from a data broker. The ISP could then link that data broker profile to the user's network usage activity.

15. ISPs, incentivized by rapid growth in the online advertising market (currently over $100 billion annually in the U.S.), continue to explore new ways to use and share consumer data. Between 2013 and 2016, for instance, AT&T operated a program ("AT&T Internet Preferences") that repurposed residential customer data for advertisement targeting. Consumers were able to decline the program, but only by paying a minimum of $29/month extra for broadband connectivity. AT&T and Verizon maintain ongoing programs that use consumer data for advertisement targeting purposes ("AT&T Relevant Advertising," "AT&T Enhanced Relevant Advertising," and "Verizon Selects"). AT&T, Comcast, and Verizon have also all recently made recent major corporate acquisitions related to consumer data and advertising.

THE 2016 FCC PRIVACY RULES AND L.D. 946

16. The FCC issued a 133-page Notice of Proposed Rulemaking for broadband privacy rules on April 1, 2016.[1] During the proceeding, the FCC received and considered over 275,000 submissions and held over 150 in-person stakeholder meetings. The Commission released a 203-page Report and Order, including final rules, on November 2, 2016.[2]

17. The FCC concluded that consumers deserve strong privacy protections when using broadband internet service. The Commission's reasoning was grounded in respecting consumer

---

[1] Protecting the Privacy of Customers of Broadband and Other Telecommunications Services, Notice of Proposed Rulemaking, 31 FCC Rcd. 2500 (2016) [hereinafter 2016 FCC NPRM].
[2] Protecting the Privacy of Customers of Broadband and Other Telecommunications Services, Report and Order, 31 FCC Rcd. 13911 (2016) [hereinafter 2016 FCC Order].

expectations about ISP privacy practices, protecting consumers from unwanted and unavoidable practices, and reinforcing consumer autonomy in privacy decision making.[3] The FCC acknowledged that the nature of the data available to ISPs poses tangible risks to consumers, including financial and physical harms.[4] The Commission also recognized that consumers face intangible risks, such as dignitary, reputational, or emotional harms.[5] The Report and Order cites survey evidence substantiating overwhelming consumer preference for opt-in privacy controls, as well as survey evidence suggesting that a lack of privacy regulation can chill consumer activity online.[6]

18. The FCC buttressed its conclusions with a range of factors that are specific to ISPs. The Report and Order highlighted the unique role of ISPs as gatekeepers to the internet; the breadth, detail, volume, and sensitivity of consumer information available to ISPs; inadequate competition in broadband markets; time, cost, and technical barriers to switching ISPs; limited consumer insight into ISP privacy practices; consumer inability to exercise control over ISP access to information; the nature of the economic relationship between ISPs and consumers (i.e., that consumers already pay a monthly fee and so would not expect to pay again with their data); and the nature of the trusted communication carriage relationship between ISPs and consumers (much like the relationships between telephone carriers and consumers, and before that, between telegraph services and consumers).[7]

19. The 2016 broadband privacy rules defined categories of covered information, required consumer notice about privacy practices, required specific consumer choices about privacy

---

[3] 2016 FCC Order ¶¶ 35-36, 166, 376, 378, 383.
[4] *Id.* ¶ 377.
[5] *Id.*
[6] *Id.* ¶¶ 379-380.
[7] *Id.* ¶¶ 28, 30-31, 35-36, 87, 126.

practices, and set a baseline security standard for protecting consumer information. These essential elements—a coverage formula that triggers notice, choice, and security requirements—are typical of sector-specific privacy regulation in the United States.

20. L.D. 946 parallels the FCC's 2016 rules in several ways. First, the FCC's 2016 rules covered "customer proprietary information," which included information that was either about consumers ("personally identifiable information") or derived from a consumer's subscription to or use of broadband service ("individually identifiable customer proprietary network information" and the "content of communications").[8] Similarly, L.D. 946 covers "customer personal information," which includes information about consumers ("personally identifying information about a customer") and information derived from service ("information from a customer's use of broadband Internet access service").[9]

21. Second, the 2016 rules also included a set of consumer notice requirements, which covered data collection, data sharing, and consumer choices.[10] L.D. 946 similarly includes a consumer notice provision, which requires ISPs to inform consumers about the privacy choices guaranteed by the statute.[11]

22. Third, the FCC rules delineated between business practices subject to an opt-in consumer choice requirement, practices subject to an opt-out choice requirement, and practices where ISPs were not required to offer consumer choice.[12] The proposed rules included a general opt-in requirement, while the final rules included an opt-in requirement for sensitive data.[13] When

---

[8] *Id.* ¶¶ 46-121.
[9] Me. Stat. tit. 35-A, § 9301(1)(C).
[10] 2016 FCC Order, at ¶¶ 122-155.
[11] Me. Stat. tit. 35-A, § 9301(6).
[12] 2016 FCC Order ¶¶ 166-220.
[13] 2016 FCC Order ¶¶ 172-173 (opt-in requirement for sensitive data); 2016 FCC NPRM ¶ 127 (general opt-in requirement, paralleling existing privacy rules for telephone service).

making this shift, the FCC deliberately adopted a broad conception of what constitutes sensitive data.[14] The FCC's definition included web browsing history, application usage history, and functional equivalents; precise geolocation information; financial information, health information, and information about children, among other categories. As a result, the FCC's shift had limited substantive effect—essentially moving ISP use and sharing of certain less sensitive subscriber information, device configuration information, and imprecise geolocation information from an opt-in requirement to an opt-out requirement.

23. L.D. 946 reflects similar nuanced judgments about the appropriate form of consumer control for specific data practices. The statute establishes a general opt-in consumer choice requirement and recognizes a category of data practices subject to opt-out choice.[15] L.D. 946 also enumerates specific data practices where ISPs are not required to offer a privacy option to consumers; this list of practices is similar to the FCC's, with the addition of an ISP's marketing of its own communications-related services (which the FCC guaranteed consumers could opt out of).[16]

24. Fourth, the FCC's rules included provisions to prevent ISPs from coercing consumers into forfeiting their privacy rights.[17] The FCC prohibited take-it-or-leave-it offers, where a consumer's broadband service would be contingent on acquiescing to ISP data practices. The FCC also recognized that financial incentives (i.e., penalties or discounts) linked to data practices could be coercive; the 2016 rules guaranteed heightened transparency for financial incentives, required that a consumer opt into an exchange of privacy for a financial benefit, and provided for

---

[14] 2016 FCC Order ¶¶ 177-191.
[15] Me. Stat. tit. 35-A, § 9301(2), (3)(A), (3)(C).
[16] *Id.* § 9301(4); 2016 FCC Order ¶¶ 201-220.
[17] 2016 FCC Order ¶¶ 294-303.

case-by-case review of incentive programs. L.D. 946 includes a ban on take-it-or-leave-it offers that parallels the FCC's rules.[18] The statute also precludes penalties or discounts linked to consumer privacy choices.[19]

25. Fifth, the 2016 rules established a baseline data security standard: ISPs would have to implement "reasonable" measures to protect consumer data, taking into account the nature of the provider, the nature of the data, and the technical feasibility of the precautions.[20] L.D. 946 includes an analogous requirement of "reasonable" data security, and the statute lists the same set of factors that the FCC articulated.[21]

26. In sum, L.D. 946 is a typical sector-specific privacy law. It includes the usual elements of sector-specific privacy regulation, and it bears similarities in substance and terminology to the FCC's 2016 privacy rules. The voluminous record that the FCC developed for its privacy rules provides factual support and justification for L.D. 946.

## INACCURATE AND MISLEADING CLAIMS IN THE COMPLAINT AND MOTION FOR JUDGMENT ON THE PLEADINGS

27. In the Complaint and the Motion for Judgment on the Pleadings, the Plaintiffs emphasize that growing use of encryption mitigates the need for broadband privacy legislation.[22] If a consumer's connection to a website is encrypted, the Plaintiffs claim, "the ISP cannot . . . determine what actions the customer performed on that website."[23] That technical claim is inaccurate.

---

[18] Me. Stat. tit. 35-A, § 9301(3)(B)(1).
[19] *Id.* § 9301(3)(B)(2).
[20] 2016 FCC Order ¶¶ 238-247.
[21] Me. Stat. tit. 35-A, § 9301(5).
[22] Compl. ¶ 26; Pls.' Mot. for J. on the Pleadings 3. The FCC considered and rejected this argument in its broadband privacy proceeding. 2016 FCC Order ¶ 33.
[23] Pls.' Mot. for J. on the Pleadings 3.

8

28. When the communication between a consumer's device and an online service is encrypted, an ISP is still usually able to observe the identity of the service and the exact timing and size of data flows between the device and the service. These patterns of network usage can reveal consumer actions. For example, if a consumer accesses the Maine Department of Labor unemployment website ("reemployme.maine.gov") every week, an ISP can infer that the consumer is receiving unemployment benefits and is filing weekly certifications required by state law. Recent research has demonstrated that network providers can draw precise inferences from encrypted traffic, using automated methods and at large scale. Studies have demonstrated the feasibility of inferring the exact webpage that a consumer is viewing, the exact video that a consumer is watching, the exact command that a consumer has issued to an internet of things device, and even spoken phrases during encrypted voice calls.[24]

29. Another technical claim that appears in the Complaint is that ISPs have a limited view of consumer online behavior, because consumers "constantly shift from one ISP to another."[25] It is true that consumers move their devices between networks. But consumers make use of very few

---

[24] Noah Apthorpe et al., *A Smart Home Is No Castle: Privacy Vulnerabilities of Encrypted IoT Traffic*, Network and Distributed System Security Symposium (2017) (internet of things devices); Brad Miller et al., *I Know Why You Went to the Clinic: Risks and Realization of HTTPS Traffic Analysis*, Privacy Enhancing Technologies Symposium (2014) (webpage visits); Roei Schuster et al., *Beauty and the Burst: Remote Identification of Encrypted Video Streams*, USENIX Security Symposium (2017) (streaming video); Charles V. Wright et al., *Spot Me If You Can: Uncovering Spoken Phrases in Encrypted VoIP Conversations*, IEEE Symposium on Security and Privacy (2008) (voice calls). *See generally* European Union Agency for Cybersecurity, *Encrypted Traffic Analysis: Use Cases & Security Challenges* 15-20, 27-29 (Nov. 2019) (summarizing research); Upturn, *What ISPs Can See: Clarifying the Technical Landscape of the Broadband Privacy Debate* 7-9 (Mar. 2016) (same).

[25] Compl. ¶ 27. The FCC also rejected this argument in its 2016 proceeding. 2016 FCC Order ¶ 29.

networks—typically just one residential provider and one mobile provider.[26] Recent research has found that these two types of ISPs account for the overwhelming majority of consumer smartphone traffic, and that on average, consumers only connect their smartphones to one Wi-Fi network per day.[27]

30. The Plaintiffs' filings repeatedly emphasize a comparison between ISPs and online services, often dubbed "edge providers" in telecommunications policy.[28] According to the Plaintiffs, "relative to many other businesses, ISPs have less access to the data that customers transmit over the Internet."[29] The comparison is not so straightforward.[30]

31. A typical online service only observes how consumers interact with the service itself. ISPs, by comparison, have access to a wide breadth of information about what consumers do online—with a perspective that spans websites, applications, and devices. ISPs also know a consumer's location and identity, which many online services do not collect. Contrary to what the Plaintiffs claim, there are not "many other businesses" with the type of cross-platform reach, consumer identification, and geolocation capabilities that ISPs have. There are only a handful of technology giants (e.g., Google and Facebook) that have broad visibility into a consumer's

---

[26] Upturn, *What ISPs Can See: Clarifying the Technical Landscape of the Broadband Privacy Debate* 6 (Mar. 2016) ("[A] user often has repeated, ongoing, long-term interactions with both her mobile and her wireline provider.").

[27] Kensuke Fukuda et al., *Tracking the Evolution and Diversity in Network Usage of Smartphones*, Internet Measurement Conference (2015) (reporting network usage measurements from a population of smartphone users).

[28] Compl. ¶¶ 22-24, 28-29; Pls.' Mot. for J. on the Pleadings 3-4.

[29] Pls.' Mot. for J. on the Pleadings 3.

[30] The FCC rejected this argument against broadband privacy protections, too. 2016 FCC Order ¶¶ 28, 30.

activities across diverse online contexts.[31] And even then, there are numerous distinctions between the technical capabilities of ISPs and those of the technology giants.

32. In comparing ISPs to online services, the Plaintiffs further assert there is an "increasing ease of access enjoyed by other businesses" with respect to consumer data.[32] This claim is also misleading. Changes in privacy technology are beginning to constrain how online services can monitor consumer activity. The popular Apple Safari and Mozilla Firefox web browsers now provide default protection against online services that track consumers across websites.[33] Google has announced that it will bring a similar feature to its Chrome web browser.[34]

33. The Plaintiffs' focus on comparing the nature and volume of consumer data between ISPs and online services also overlooks a number of other germane technical, economic, and policy considerations. As the FCC recognized in 2016, consumer expectations and preferences about ISPs, the competition dynamics of the ISP market, the nature of the consumer-carrier relationship, limited consumer insight into ISP privacy practices, and the lack of alternative consumer controls are additional relevant factors for broadband privacy regulation.[35]

---

[31] Steven Englehardt & Arvind Narayanan, *Online Tracking: A 1-million-site Measurement and Analysis*, ACM Conference on Computer and Communications Security (2016) (in a survey of a million websites, finding that only Google and Facebook are capable of tracking users across more than 20% of websites).
[32] Pls.' Mot. for J. on the Pleadings 3.
[33] John Wilander, *Full Third-Party Cookie Blocking and More*, WebKit Blog (Mar. 24, 2020), https://webkit.org/blog/10218/full-third-party-cookie-blocking-and-more/ (announcing that "[c]ookies for cross-site resources are now blocked by default across the board" for Apple Safari); Marissa Wood, *Today's Firefox Blocks Third-Party Tracking Cookies and Cryptomining by Default*, Mozilla Blog (Sept. 3, 2019), https://blog.mozilla.org/blog/2019/09/03/todays-firefox-blocks-third-party-tracking-cookies-and-cryptomining-by-default/ (announcing default tracking protections for Mozilla Firefox).
[34] Justin Schuh, *Building a More Private Web: A Path Towards Making Third Party Cookies Obsolete*, Chromium Blog (Jan. 14, 2020), https://blog.chromium.org/2020/01/building-more-private-web-path-towards.html ("[W]e plan to phase out support for third-party cookies in Chrome. Our intention is to do this within two years.").
[35] 2016 FCC Order ¶¶ 31, 35-36.

## CONCLUSION

34. Contrary to the Plaintiffs' claims, L.D. 946 is grounded in specific, articulable, and substantial consumer privacy interests. The elements of Maine's law are typical of sector-specific privacy regulation and parallel prior federal rules. And both the Complaint and the Motion for Judgment on the Pleadings contain factual inaccuracies and misleading characterizations about ISP privacy considerations.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 27, 2020                                                /s/ Jonathan R. Mayer

                                                                           Dr. Jonathan R. Mayer

## **CERTIFICATE OF SERVICE**

I hereby certify that on this, the 27th day of May, 2020, I electronically filed the above document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to each of the following:

SCOTT H. ANGSTREICH
sangstreich@kellogghansen.com

SARAH E. ERICKSON-MUSCHKO
sericksonmuschko@gibsondunn.com

DENIS NICHOLAS HARPER
nharper@gibsondunn.com

JEFFREY A. LAMKEN
jlamken@mololamken.com

ALEX ATTICUS PARKINSON
aparkinson@kellogghansen.com

JOSHUA A. RANDLETT
jrandlett@rudmanwinchell.com

JACOB T. SPENCER
jspencer@gibsondunn.com

HELGI C. WALKER
hwalker@gibsondunn.com

COLLIN R. WHITE
cwhite@kellogghansen.com

SARAH AKHTAR
sakhtar@gibsondunn.com

    /s/ Jason Anton
    Assistant Attorney General
    jason.anton@maine.gov