## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

ACA CONNECTS – AMERICA'S
COMMUNICATIONS ASSOCIATION *et al.*,

        Plaintiffs,

      v.

AARON M. FREY, in his official capacity as
the Attorney General of the State of Maine,

        Defendant.

Civil Action No. 1:20-cv-00055-LEW

## BRIEF OF THE KNIGHT FIRST AMENDMENT INSTITUTE
## AT COLUMBIA UNIVERSITY AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT'S
## OPPOSITION TO JUDGMENT ON THE PLEADINGS

Richard L. O' Meara, Bar No. 3510
Murray, Plumb & Murray
75 Pearl Street, P.O. Box 9785
Portland, ME 04104-5085
(207) 773-5651
romeara@mpmlaw.com

Ramya Krishnan*
Leena Charlton*
Alex Abdo*
Jameel Jaffer*
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
ramya.krishnan@knightcolumbia.org
(646) 745-8500

*pro hac vice* certification pending

*Counsel for Amicus Curiae*

**Table of Contents**

Table of Authorities ...................................................................................................ii

Introduction ................................................................................................................1

Argument....................................................................................................................3

I.     Absent evidence of viewpoint discrimination, a law that regulates the commercial exchange of data should not be subject to heightened First Amendment scrutiny unless the exchange is protected expression............................3

     A.     Laws that regulate commercial activity are generally not subject to heightened scrutiny. ......................................................................3

     B.     A law that regulates the commercial exchange of data should generally not be subject to heightened scrutiny unless the exchange is protected expression. ...................................................................5

     C.     *Sorrell* is consistent with this principle........................................................11

     D.     A contrary rule would imperil legislation necessary to protect individual privacy as well as the freedoms of inquiry, speech, and association. ...............................................................................12

II.     Maine's law does not warrant heightened First Amendment scrutiny. .....................16

     A.     The commercial exchange of data between internet users and their ISPs to facilitate internet access is not protected expression..........................16

     B.     Maine's law is not viewpoint discriminatory. ...............................................19

Conclusion................................................................................................................20

## Table of Authorities

**Cases**

*44 Liquormart, Inc v. Rhode Island,* 517 U.S. 484 (1996)............................................................5

*Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)...................................6

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ......................................................................18

*Bartnicki v. Vopper*, 532 U.S. 514 (2001).....................................................................................15

*Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579 (S.D.N.Y. 2016)......................................................................................................................................12

*Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427 (S.D.N.Y. 2016) ..................................12

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011).............................................................6

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ...................................................... 12, 17, 18

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980).............................................................................................................. 1, 5, 10

*Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991)........................................................................9

*Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73 (1st Cir. 2007)..............................................8

*Edenfield v. Fane*, 507 U.S. 761 (1993)......................................................................................10

*First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765 (1978) .......................................................5, 10

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ....................................................4, 8

*Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457 (1997) .................................................4

*Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116 (3rd Cir. 2020).............................................................................................................................12

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995)........................6

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .............................................................6, 17

*King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303 (E.D. Pa. 2012)..........................................12

*Lowe v. SEC*, 472 U.S. 181 (1985) ............................................................................................7, 9

*NAACP v. Alabama*, 357 U.S. 449 (1958) ..................................................................................15

*Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361
(2018) ....................................................................................................... 3, 5, 7

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) .......................................... 8

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978).................................... 4

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376
(1973) .................................................................................................................. 9

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992) ...................... 7

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992)............................................... 8

*Reno v. Condon*, 528 U.S. 141 (2000) ........................................................... 17

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47
(2006) ............................................................................................................ 4, 7, 8

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).................................... passim

*Spence v. State of Wash.*, 418 U.S. 405 (1974) ............................................... 6

*Texas v. Johnson*, 491 U.S. 397 (1989) .......................................................... 6

*United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381 (D.C. Cir.
2017).................................................................................................................... 19

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938)........................... 4

*United States v. O'Brien*, 391 U.S. 367 (1968) ................................... 1, 7, 18

*United States v. U.S. Dist. Ct.*, 407 U.S. 297 (1972) .................................... 14

*Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976)................... 9

*Williamson v. Lee Optical of Okla., Inc.*, 348 U. S. 483 (1955)..................... 4

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991)....................... 9

*Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293 (11th Cir. 2017) ........... 12

**Statutes**

15 U.S.C. § 6802................................................................................................13

18 U.S.C. § 2702................................................................................................13

18 U.S.C. § 2710................................................................................................13

20 U.S.C. § 1232g ................................................................................................. 13

26 U.S.C. § 7216 .................................................................................................... 13

42 U.S.C. §§ 1320–1322 ........................................................................................ 13

47 U.S.C. § 222 ...................................................................................................... 13

47 U.S.C. § 551 ...................................................................................................... 13

Me. Rev. Stat. tit. 35-A, § 9301 ................................................................. 16, 19, 20

**Other Authorities**

Amanda Shanor, *First Amendment Coverage*, 93 N.Y.U. L. Rev. 318 (2018) ........................... 10

Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765 (2004) ................................ 4

Jack Balkin, *Free Speech in the Algorithmic Society*, 51 U.C. Davis L. Rev. 1149 (2018) ........................................................................................................................ 18

Lee C. Bollinger, *The Tolerant Society* (1986) ........................................................ 10

Robert C. Post, *Democracy, Expertise, and Academic Freedom: First Amendment Jurisprudence for the Modern State* (2012) ........................................................ 8

Robert C. Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev. 1249 (1995) ................................................................................................................. 9, 10

Tim Wu, *Machine Speech*, 161 U. Penn. L. Rev. 1495 (2013) ............................... 8, 9

Vincent Blasi, *The Checking Value in First Amendment Theory*, 2(3) American B. Found. Res. J. 521 (1977) ........................................................................................ 10

**Rules**

Code of Prof'l Conduct r. 1.700.001 *et seq.* (Am. Inst. of Certified Pub. Accountants 2014) ................................................................................................... 13

Model Code of Prof'l Conduct r. 1.6 (Am. Bar Ass'n 2018) ................................... 13

**Regulations**

45 C.F.R. §§ 160, 164 ........................................................................................... 13

**Introduction**

This case concerns the constitutionality of a Maine data privacy law that regulates the terms on which ISPs may sell broadband internet service. The law generally requires ISPs to obtain customer consent before using private and proprietary customer information exposed in connection with that service. A threshold question here is whether Maine's law should be subject to heightened First Amendment scrutiny—either to strict scrutiny, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), or to intermediate scrutiny, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980). Because Maine's law does not regulate speech, and because it is not intended or designed to suppress a particular viewpoint, neither form of heightened scrutiny is warranted here. To the extent the plaintiffs argue that the law should be reviewed under *United States v. O'Brien*, 391 U.S. 367 (1968), the Court need not address that question, because the law would plainly survive that review.

To be sure, the commercial activity in this case involves the exchange of data. But not every commercial exchange of data is expressive, and accordingly not every law that regulates the commercial exchange of data should be understood as a law that regulates speech. A person who takes her laptop to Best Buy for repairs must turn over her hard drive and all of the data it contains, but she does not intend this transfer of data to be expressive, and no one would understand it to be expressive. The exchange is a purely functional one, meant to facilitate a service. Similarly, a person who takes a letter to the post office to be mailed does not intend the transfer of the letter to the post office to express anything to the post office, though she of course intends to express a message to the letter's recipient. The transfer of the data to the post office, like the transfer of the laptop to Best Buy, is a purely functional one, meant to facilitate the provision of a service. In both cases, the transfer of data is incidental to the transaction. The person who takes her laptop to Best

Buy doesn't want to give data to Best Buy; she wants to have her laptop repaired. The person who takes her letter to the post office doesn't want to give data to the post office; she wants to have her letter delivered to its intended recipient. The laptop-owner and the letter-mailer expose data only because they have to do so in order to receive the service they need. This is not "speech" in the First Amendment sense of the word.

The same is true here. To access and use the internet, Maine residents must contract with an ISP and furnish that ISP with highly sensitive data, including the addresses of the websites they want to visit as well as the full content of any unencrypted data they wish to exchange with those sites. When users provide this data to their ISPs, they do not intend the transfer to be expressive with respect to their ISPs, and the ISPs do not receive the transferred data as expression. And like the laptop-owner and letter-mailer, internet users have no choice but to provide this data. Their data is exposed to the ISPs unavoidably and automatically as a result of their use of the internet. Because this transfer of data is not expressive, it is not speech within the meaning of the First Amendment. Neither a law that required computer repair shops to obtain customer consent before selling the data on customers' hard drives, nor a law that similarly restricted mail-carrier's ability to sell the contents of the letters they carry, would properly be understood as a regulation of speech. Maine's law should not be understood as one either.

The Supreme Court has never endorsed the categorical proposition that every commercial exchange of data is speech within the meaning of the First Amendment. To determine whether an activity is protected expression, the Court has looked to the activity's social meaning. It has considered, for example, whether the activity belongs to a recognized medium of expression; whether it reflects an intent to convey a message, and whether the message is likely to be understood; whether it takes place within a relationship of relative symmetry rather than within

one of trust or reliance; and whether it is intended to filter important information to the public. This challenge of assessing an activity's social meaning can be a difficult, but it is also unavoidable, as the Court has observed. Dispensing with the inquiry would unmoor the First Amendment from the values and functions it was meant to serve.

Indeed, to hold that every commercial exchange of data is speech within the meaning of the First Amendment would have intolerable consequences. It would call into question the constitutionality of a broad range of existing privacy and confidentiality rules that have never been thought to raise First Amendment concerns. It would also impede legislatures from enacting new privacy protections that may be crucial to ensuring that the freedoms of inquiry, speech, and association survive and flourish in the digital age. For these reasons, and others discussed below, heightened scrutiny is unwarranted here, and the Court should uphold Maine's law as a reasonable effort to safeguard personal privacy.

<strong>Argument</strong>

I.   **Absent evidence of viewpoint discrimination, a law that regulates the commercial exchange of data should not be subject to heightened First Amendment scrutiny unless the exchange is protected expression.**

A.   **Laws that regulate commercial activity are generally not subject to heightened scrutiny.**

Laws regulating commercial activity generally fall outside the First Amendment's ambit. As the Supreme Court has recognized, "restrictions on economic activity or, more generally, non-expressive conduct," are distinct from "restrictions on protected expression." *Sorrell*, 564 U.S. at 567 (2011). As a general matter, restrictions on economic activity do not implicate the concerns that animate the First Amendment, and accordingly courts do not subject these restrictions to First Amendment scrutiny even if they impose incidental burdens on speech. *Nat'l Inst. of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2373 (2018) ("[T]he First Amendment does

3

not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (quoting *Sorrell*, 564 U.S. at 567)). While there are important exceptions to this rule, courts give legislatures broad latitude in the regulation of economic activity. *See, e.g.*, *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 477 (1997) (stating that economic regulations carry "a strong presumption of validity"); *cf. United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) (stating that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless" it fails to "rest[] upon some rational basis"); *accord Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 488 (1955).

These principles hold true even as to commercial regulations that directly restrict "speech" as the term is colloquially understood. As the Supreme Court has noted, "it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* (*FAIR*), 547 U.S. 47, 62 (2006) (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)). Nearly all commercial activity takes place through communication or expression, and accordingly nearly all commercial regulation touches on communication or expression in one way or another. Speech (in its colloquial meaning) "is what we use to enter into contracts, make wills, sell securities," and carry out any number of commercial transactions. *See* Frederick Schauer, *The Boundaries of the First Amendment: A Preliminary Exploration of Constitutional Salience*, 117 Harv. L. Rev. 1765, 1773 (2004). "Numerous examples could be cited of communications that are regulated without offending the First Amendment." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (collecting examples from securities, antitrust, and labor laws). "Each of these examples illustrates

that the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Id.*

Still, the Supreme Court has subjected commercial regulations to heightened scrutiny under the First Amendment in some circumstances. Most notably, it has done so when the regulations directly restrict "commercial speech," or "speech proposing a commercial transaction," on the ground that such speech plays a crucial "informational function" for consumers. *Cent. Hudson*, 447 U.S. at 562–63; *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1978) ("A commercial advertisement is constitutionally protected not so much because it pertains to the seller's business as because it furthers the societal interest in the 'free flow of commercial information.'" (citation omitted)). Even here, however, the Court has tread carefully, wary of allowing the First Amendment to be transformed into a general-purpose deregulatory tool. *See, e.g.*, *44 Liquormart, Inc v. Rhode Island,* 517 U.S. 484, 499 (1996) (Stevens, J., plurality opinion) ("The entire commercial speech doctrine, after all, represents an accommodation between the right to speak and hear expression *about* goods and services and the right of government to regulate the sales *of* such goods and services." (quoting L. Tribe, American Constitutional Law §§ 12–15, p. 903 (2d ed. 1988))). The task of differentiating between "regulations of economic activity" and "regulations of protected expression" is at times challenging, but it is also unavoidable. *See NIFLA*, 138 S. Ct. at 2373 ("While drawing the line between speech and conduct can be difficult, this Court's precedents have long drawn it.").

### B.    A law that regulates the commercial exchange of data should generally not be subject to heightened scrutiny unless the exchange is protected expression.

Absent evidence of viewpoint discrimination, a law that regulates the commercial exchange of data should be subject to heightened scrutiny only if the exchange is speech within the meaning of the First Amendment. Whether an exchange of data is speech is a question of the

5

exchange's social meaning. The Supreme Court has assessed an activity's social meaning by considering a variety of factors.

The Court has sometimes considered whether the activity belongs to a recognized medium of expression. In *Joseph Burstyn, Inc. v. Wilson*, for example, the Court held that "motion pictures" are speech within the meaning of the First Amendment because they are "a significant medium for the communication of ideas." 343 U.S. 495, 501 (1952). On similar reasoning, the Court later reached essentially the same conclusion about parades, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 568–69 (1995), and video games, *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 790 (2011). Important to the Court's reasoning in these cases was that the activities in question played an important role in informing or sustaining public discourse. *See, e.g.*, *Joseph Burstyn*, 343 U.S. at 501 (recognizing that movies "may affect public attitudes and behavior in a variety of ways"); *see also Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (holding that "audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas").

The Supreme Court has also considered whether the putative speaker intended to communicate an idea or a message—whether "an intent to convey a particularized message was present"—and whether "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. State of Wash.*, 418 U.S. 405, 410–11 (1974). Thus, in *Texas v. Johnson*, the Supreme Court held that the defendant's flag burning was protected speech because its "expressive, overtly political nature . . . was both intentional and overwhelmingly apparent." 491 U.S. 397, 406 (1989). It is true that an intent to convey a particularized message is neither a necessary nor a sufficient condition for First Amendment protection. *Compare Hurley*, 515 U.S. at 569 (stating that an intent to convey a

"particularized message" is not necessary), *with O'Brien*, 391 U.S. at 376  (rejecting "the view that an apparently limitless variety of conduct can be labelled 'speech' whenever the person engaging in the conduct intends thereby to express an idea"), *and FAIR*, 547 U.S. at 66 (suggesting that an activity will be protected by the First Amendment only if it is "inherently expressive," meaning that its message can be understood without additional explanation). Still, the Court has sometimes found it relevant that the putative speaker intended to convey a message and that the message was likely to be understood.

The Court has also considered whether the communication took place in the context of a relationship of trust or reliance, reasoning that communications within these asymmetrical relationships do not ordinarily engage the concerns animating the First Amendment. As Justice White explained in *Lowe v. SEC*:

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession.

472 U.S. 181, 232 (1985); *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (upholding "a requirement that a doctor give a woman certain information as part of obtaining her consent to an abortion" because it regulated speech only "as part of the practice of medicine, subject to reasonable licensing and regulation by the State"); *cf. NIFLA*, 138 S. Ct. at 2373–74 (acknowledging that "this Court has upheld regulations of professional conduct that incidentally burden speech," but holding that a compelled disclosure outside of a client relationship was not a regulation of professional conduct but rather a regulation of "speech *as speech*" (emphasis added)). The Court has found the existence of asymmetries relevant beyond the professional-client context. For example, in *Gissel*, the Court held that employer threats of

7

retaliation for the labor activities of employees are not speech under the First Amendment. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618–19 (1969). Recognizing the "economic dependence" of employees, the Court held that an employer's right of expression must be balanced against "the equal rights of the employees to associate freely." *Id.* at 617. Thus, while an employer is "free to communicate to his employees any of his general views about unionism or any specific views about a particular union," he is not entitled to engage in communications that "contain a 'threat of reprisal or force or promise of benefit.'" *Id.* at 618. These communications, the Court held, are "without the protection of the First Amendment." *Id.*; *see also* Robert C. Post, *Democracy, Expertise, and Academic Freedom: First Amendment Jurisprudence for the Modern State* 23 (2012) (explaining that communications within certain relationships of reliance are generally not regarded as part of public discourse).

The Court has also considered whether the communication performs some task unrelated to expression. As the Court has recognized, "words can in some circumstances violate laws directed not against speech but against conduct." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992); *accord Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 83 (1st Cir. 2007); Tim Wu, *Machine Speech*, 161 U. Penn. L. Rev. 1495, 1523 (2013) ("[S]ome communications don't simply express a view, or even cause some effect, but accomplish something by their very utterance."). Thus, for example, a law prohibiting discrimination in the workplace would have the effect of requiring "an employer to take down a sign reading 'White Applicants Only,'" but the law would not "be analyzed as one regulating the employer's speech rather than conduct." *FAIR*, 547 U.S. at 62; *see also Gissel*, 395 U.S. at 618–19 (holding that the First Amendment is not implicated by employer threats of retaliation for labor activities by employees); *Giboney*, 336 U.S. at 502–04 (same with respect to picketing for the purpose of forcing the person picketed to violate the law);

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 387–89 (1973) (same with respect to a newspaper's publication of discriminatory job ads). Similarly, contract law has the effect of regulating offers, acceptances, and agreements—all of which are communicative—but these regulatory effects are not ordinarily subject to First Amendment scrutiny. *See Lowe*, 472 U.S. at 232 ("[O]ffer and acceptance are communications incidental to the regulable transaction called a contract"); *cf. Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991) (holding that the First Amendment does not bar enforcement of a newspaper's promise of confidentiality to a source).[1]

Finally, courts have sometimes given weight to whether the regulated activity is carried out to filter important information into the marketplace. As noted above, this was the Court's justification for extending First Amendment protection to "commercial speech." In *Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, the Court reasoned that "even if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy," protecting advertising serves that end because it is "indispensable" not only to ensuring that economic decisions "in the aggregate, be intelligent and well informed," but also to "the formation of intelligent opinions as to how [the economic system] ought to be regulated or altered." 425 U.S. 748, 764–65 (1976). The Court has reaffirmed this reasoning many times. *See*

---

[1] Another example: navigation charts are not considered to be protected speech because such charts are understood to be functional (as opposed to expressive) and because of the manner in which users must rely on them. As one scholar has noted, navigation charts undoubtedly communicate information, but when found to be defective and cause injury, courts have had no trouble holding the charts' authors liable under tort law. Robert C. Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev. 1249, 1254 (1995) (collecting cases); *see also* Tim Wu, *Machine Speech*, 161 U. Penn. L. Rev. 1495, 1522–23 (2013). The reason is that charts are "highly technical tools." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991). Unlike "a book on how to *use* . . . an aeronautical chart," which is "pure thought and expression," the chart itself is "like a physical 'product,'" and the chart's user relies on it as such. *Id.*

*Edenfield v. Fane*, 507 U.S. 761, 766 (1993) ("First Amendment coverage of commercial speech is designed to safeguard" society's "interest[] in broad access to complete and accurate commercial information"); *Cent. Hudson*, 447 U.S. at 563 ("The First Amendment's concern for commercial speech is based on the informational function of advertising." (citing *Bellotti*, 435 U.S. at 783)). These cases suggest that commercial activities will be more likely to receive First Amendment protection if they directly inform public discourse.

These factors cannot be applied in any mechanical way, not least because the Supreme Court has given them different weights in different contexts. But the basic task of distinguishing regulations of economic activity from regulations of protected speech is unavoidable. For reasons already discussed, to subject every economic regulation that touches on expression to heightened First Amendment scrutiny would radically expand the First Amendment's ambit and divorce the First Amendment from the values it was meant to serve. *See* Robert Post, *Recuperating First Amendment Doctrine*, 47 Stan. L. Rev. 1249, 1255, 1277 (1995); Lee C. Bollinger, *The Tolerant Society* 8 (1986); Vincent Blasi, *The Checking Value in First Amendment Theory*, 2(3) American B. Found. Res. J. 521, 527 (1977); Amanda Shanor, *First Amendment Coverage*, 93 N.Y.U. L. Rev. 318, 361–64 (2018). Whether the First Amendment is implicated by a law regulating the exchange of data must turn on the social meaning of the exchange in that particular context. While the proposition that every exchange of data is "speech" seems simple, this veneer of simplicity dissolves on closer examination, as the Best Buy and post office examples already mentioned make clear. And it is easy enough to come up with further examples. Consider a law requiring hair salons to obtain customer consent before using their customers' hair clippings rather than disposing of them, or a law requiring laboratories to obtain customer consent before using blood samples for purposes unrelated to the requested blood work. By necessity, customers in these contexts supply

samples of their DNA in the course of their commercial transactions. But these exchanges of data are not expressive, and no one would consider them to be. The exchanges do not belong to a medium of expression, nor are they intended or understood to communicate a message. Instead, they are functional, made solely to facilitate the provision of a service. That a hair salon or laboratory might see a commercial opportunity in the possibility of sequencing its clients' or patients' DNA for targeted advertising would not change this analysis.

      C.    *Sorrell* **is consistent with this principle.**

In *Sorrell*, the Supreme Court held unconstitutional a Vermont law that "restrict[ed] the sale, disclosure, and use of pharmacy records that reveal the prescribing practices of individual doctors," 564 U.S. at 557, on the ground that the law was an effort "to tilt public debate in a preferred direction," *id.* at 578–79. The Court found that Vermont's law targeted the marketing of brand-name drugs by drug manufacturers "to diminish the effectiveness of [that] marketing," and to advance the state's goal of promoting the prescription of less-expensive generic alternatives. *Id.* at 565. Because the Court held that the Vermont law reflected viewpoint discrimination, it subjected the law to heightened scrutiny. *Id.* at 571. The Court ultimately concluded: "The State has burdened a form of protected expression that it has found too persuasive. At the same time, the State has left unburdened those speakers whose messages are in accord with its own views. This the State cannot do." *Id.* at 580.

While the Court observed that it had in other contexts "held that the creation and dissemination of information are speech within the meaning of the First Amendment," *id.* at 570, it did not hold that every exchange of data is speech. Nor did the Court resolve the question of when a commercial regulation must be subject to heightened scrutiny. The Court made clear that even if prescriber-identifying information were, as Vermont argued, "a mere commodity," *id.* at

571, the law's viewpoint discrimination was "sufficient to justify application of heightened scrutiny," *id*.[2]

### D.   A contrary rule would imperil legislation necessary to protect individual privacy as well as the freedoms of inquiry, speech, and association.

Subjecting every law that regulates the commercial exchange of data to heightened First Amendment scrutiny would lead to intolerable results. It would call into question the constitutionality of a broad array of confidentiality rules and consumer protection laws. It would also make it more difficult for legislatures to enact new privacy laws that may be necessary to ensure that the freedoms of inquiry, speech, and association survive and flourish in the digital age.

Living in the modern world requires exposing sensitive data to others. We share our credit card numbers and billing addresses when we make purchases. We share medical information with pharmacists, doctors, hospitals, and insurance companies. We share financial information with financial aid offices, mortgage brokers, accountants, realtors, and banks. Often, we share sensitive data without even realizing we are sharing it. *See, e.g.*, *Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (noting that cell phone location data "is not truly 'shared' as one normally understands the term"). Most relevant to this case, accessing the internet requires us to expose sensitive data to ISPs. This is not simply because ISPs demand the data as a condition of service, but because, as a

---

[2] Other courts have recognized that the Court applied heightened scrutiny in *Sorrell* because it found that the law reflected viewpoint discrimination. *See Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 139–40 (3rd Cir. 2020); *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1313–14 (11th Cir. 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 450 (S.D.N.Y. 2016); *Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 601 (S.D.N.Y. 2016); *King v. Gen. Info. Servs., Inc.*, 903 F. Supp. 2d 303, 309 (E.D. Pa. 2012); *see also Principles of Law, Data Privacy* § 1 n. 7 (Am. L. Inst. 2019) (*Sorrell* "is better construed to mean that government may not regulate the transmission of data 'in order to tilt public debate in a preferred direction.'" (quoting *Sorrell*, 564 U.S at 578–79)).

technical matter, the ISPs' devices cannot route our internet traffic without the addresses of the websites we visit, as well as the actual data we exchange with those websites.

Because of the sensitivity of the data all of us routinely and unavoidably share in order to live in the modern world, we have countless laws, regulations, and rules requiring recipients of the data to safeguard it. Thus, financial institutions are subject to restrictions on the disclosure of consumer information. 15 U.S.C. § 6802(b). Hospitals are subject to restrictions on the disclosure of patients' medical information. 42 U.S.C. §§ 1320–1322; 45 C.F.R. §§ 160, 164. Accountants, lawyers, and other professionals must comply with restrictions on the use of information provided to them by their clients. *See, e.g.*, Code of Prof'l Conduct r. 1.700.001 *et seq.* (Am. Inst. of Certified Pub. Accountants 2014); Model Code of Prof'l Conduct r. 1.6 (Am. Bar Ass'n 2018). Preparers of tax returns are subject to analogous restrictions. 26 U.S.C. § 7216. Schools and universities must comply with restrictions on the use of student records. 20 U.S.C. § 1232g(b). Telephone companies must comply with restrictions on the use of their customers' proprietary information. 47 U.S.C. § 222. Cable television providers and video rental stores must comply with restrictions on the disclosure of their customers' viewing or renting habits. 47 U.S.C. § 551(c)(1); 18 U.S.C. § 2710. And providers of electronic communication and remote computing services must comply with restrictions on using or disclosing the content and related metadata of their customers' communications. 18 U.S.C. § 2702.

If the courts treated every exchange of data as protected speech, and every restriction on an exchange of data as suspect under the First Amendment, all of the laws, regulations, and rules listed above would be imperiled. Email providers would be able to invoke the First Amendment in challenging the restrictions that limit their ability to share the contents of users' emails. Schools would be able to invoke the First Amendment in challenging the restrictions that limit their ability

to sell student records. Hospitals would be able to invoke the First Amendment in challenging the restrictions that limit their ability to sell patients' medical information to drug and insurance companies. And these restrictions would be the targets of as-applied First Amendment challenges as well as facial challenges. An accountant could rely on the First Amendment to challenge the restrictions that prevent her from sharing a particular client's tax returns with the press, for example. It is doubtful that many of the laws, regulations, and rules mentioned above could survive heightened First Amendment scrutiny. Many of them are complicated schemes, riddled with exceptions. Challengers would undoubtedly claim that the exceptions evinced a lack of narrow tailoring. The laws would survive heightened scrutiny only if heightened scrutiny were watered down significantly, a result that would likely have implications for all kinds of speech, including beyond the commercial sphere.

Commercial regulations that restrict the exchange of data should be subject to heightened scrutiny where the exchange is protected expression. The critical point about the kind of privacy laws canvased above is that, while they regulate the commercial exchange of data, the exchange of data is *not* expressive. These laws regulate the exchange of a commodity that happens to take the form of data.

Requiring all commercial regulations that restrict the exchange of data to survive heightened First Amendment scrutiny would compromise legislatures' ability to protect individual privacy. But compromising their ability to protect individual privacy would have implications for the freedoms of inquiry, speech, and association as well. Courts have long recognized that government surveillance has the ability to chill protected expression. *See, e.g.*, *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 320 (1972) ("Official surveillance . . . risks infringement of constitutionally protected privacy of speech."); *accord NAACP v. Alabama*, 357 U.S. 449, 462–63

(1958). Private surveillance can have the same effect. *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) ("[F]ear of public disclosure of private conversations might well have a chilling effect on private speech."). In 2010, the Federal Communications Commission ("FCC") released a survey of broadband internet adoption showing that fifty-seven percent of Americans who had not signed up for broadband access worried about their privacy online.[3] The same year, the FCC released its "National Broadband Plan," which concluded, based on the same survey, that "privacy concerns can serve as a barrier to the adoption and utilization of broadband [internet access]."[4] The National Telecommunications and Information Administration, an agency within the Department of Commerce, has reached similar conclusions in two studies of online households, finding that privacy and security concerns have caused a substantial percentage of internet users to hold back from "conducting financial transactions, buying goods or services, posting on social networks, or expressing opinions on controversial or political issues via the Internet."[5]

In short, the protection of privacy is often crucial to free speech. Subjecting to heightened scrutiny every effort to safeguard customers' reasonable expectations of privacy in their sensitive data would seriously undermine First Amendment values.

---

[3] John Horrigan, *Broadband Adoption and Use in America: Results from an FCC Survey* 17 (FCC Nat'l Broadband Plan, Working Paper No. 1, 2010), https://perma.cc/QU5D-DT39.

[4] Fed. Commc'n Comm'n, *Connecting America: The National Broadband Plan*, at 53–54 (2010), https://perma.cc/7B3Q-T7MY.

[5] Rafi Goldberg, *Lack of Trust in Internet Privacy and Security May Deter Economic and Other Online Activities*, NTIA (May 13, 2016), https://perma.cc/Y9RH-SHCV; Rafi Goldberg, *Most Americans Continue to Have Privacy and Security Concerns, NTIA Survey Finds*, NTIA (August 20, 2018), https://perma.cc/9B22-GUD.

**II.    Maine's law does not warrant heightened First Amendment scrutiny.**

The commercial exchange of data regulated by Maine's law is not protected expression, and the law neither reflects nor was motivated by viewpoint discrimination. Accordingly, heightened First Amendment scrutiny is not warranted.

**A.    The commercial exchange of data between internet users and their ISPs to facilitate internet access is not protected expression.**

Maine's law regulates the terms of a commercial transaction. Specifically, the law's opt-in and opt-out requirements regulate the terms on which ISPs may offer broadband internet service, including by requiring ISPs to obtain customer consent before using private and proprietary customer information exposed in the context of that service for unrelated purposes. Under the law's opt-in requirement, ISPs must obtain express customer consent before using, disclosing, selling, or permitting access to "customer personal information," Me. Rev. Stat. tit. 35-A, § 9301(2), (3)(A) (2020), which the law defines as "[p]ersonally identifying information about a customer" and "[i]nformation from a customer's use of broadband [internet] service." *Id.* § 9301(1)(C). The term encompasses "the customer's name, billing information, social security number, billing address and demographic data"; the customer's "web browsing history," "application usage history," "precise geolocation information," and "device identifier"; and the "content of the customer's communications." *Id.* Under the law's opt-out requirement, ISPs may use, disclose, sell, or permit access to any other information "pertaining to a customer," unless the customer provides written notice opting out. *Id.* § 9301(3). Finally, the law prohibits ISPs from refusing to provide internet service to a customer who does not provide opt-in consent, and from charging a customer a penalty, or offering a customer a discount, based on her decision to provide or not provide opt-in consent. *Id.* § 9301(3)(B). The law does not prevent ISPs from separately contracting with their customers for the use of their data.

16

Maine's opt-in and opt-out requirements regulate the non-expressive commercial exchange of data and, for that reason, should not be subject to heightened First Amendment scrutiny as direct regulations of speech. The factors that the Supreme Court has considered in determining the reach of the First Amendment point to this conclusion. To begin, the exchange of data between internet users and their ISPs is obviously not a "significant medium for the communication of ideas." *Joseph Burstyn*, 343 U.S. at 501. In fact, the exchange is not expressive at all but purely functional. Individuals cannot gain access to the internet, or route their own online traffic, without an ISP. When an internet user wishes to connect to a website on the internet, her computer must send to her ISP's network the Internet Protocol address of the site she wants to communicate with, together with the data she wants her ISP to deliver to that website. This exchange of data with the ISP does not belong to any recognized medium of expression. It is akin to handing an envelope or a post card to a mail carrier for delivery. *Cf. Reno v. Condon*, 528 U.S. 141, 148 (2000) (in upholding the Driver's Privacy Protection Act of 1994 against a Commerce Clause challenge, holding that drivers' license information is "used in the stream of interstate commerce" and is, "in this context, an article of commerce").

Nor do the user or the ISP intend or understand the data to be expressive at the point it is exchanged. It is shared incidentally and unavoidably by the customer to obtain internet access, and it is received by the ISP's routers so that the ISP can provide that access.[6] Indeed, the data is not "truly 'shared' as one normally understands the term." *Carpenter*, 138 S. Ct. at 2220. In *Carpenter*, the Supreme Court held that cell phone users have a reasonable expectation of privacy in location data they must share with their phone companies to obtain service. In so holding, the Supreme

---

[6] That the law does not prohibit ISPs from separately contracting with their customers for the purchase of their data underscores that the law is focused on data shared incidentally to the provision of broadband internet service.

Court rejected the claim that cell phone users expose this data voluntarily. Cell phones are "'such a pervasive and insistent part of daily life' that carrying one is indispensable to participation in modern life," the Court wrote, *id.* (citation omitted), and using a cell phone generates "a cell-site record by dint of its operation, without any affirmative act on the user's part beyond powering up," *id.; see also id.* ("Apart from disconnecting from the network, there is no way to avoid leaving a trail of location data."). The situation is the same here. Most Americans consider a broadband connection an essential part of everyday life, yet it is impossible to use one without exposing to an ISP a detailed record of one's online activities.[7] Customers do not exchange their data to convey a message to their ISPs, to promote public discussion, or to filter new information into the public domain. Instead, they exchange their data solely to facilitate the provision of a service, and they have no choice but to rely on the ISPs to handle their data for the purposes of that service. *See* Jack Balkin, *Free Speech in the Algorithmic Society*, 51 U.C. Davis L. Rev. 1149, 1162 (2018) (describing the "significant asymmetries of power and knowledge" ISPs enjoy over their customers).

For these reasons, the commercial exchange of data that Maine's law regulates is not protected expression.[8]

---

[7] *See* Pew Research Center, *53% of Americans Say the Internet Has Been Essential During the COVID-19 Outbreak* (Apr. 30, 2020), https://perma.cc/HTE4-BKUR (noting that "87% of adults say the internet has been at least important for them personally during the coronavirus outbreak"); *Protecting the Privacy of Customers of Broadband and Other Telecommunications Services*, WC Docket No. 16-106, Notice of Proposed Rulemaking, FCC 16-39 ¶ 18 (Apr. 1, 2016) (noting that "the use of information for the delivery of broadband services is inherent in the customer-broadband provider relationship").

[8] The plaintiffs in this case argue that by regulating the commercial exchange of data, Maine's law burdens ISPs' *later use* of the data in targeted advertising. But this burden is merely incidental. Some incidental burdens on expression trigger First Amendment scrutiny under *O'Brien*. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986). The Court need not determine whether the incidental burdens that Maine's law may impose trigger that scrutiny, because even assuming that they do, Maine's law would survive this scrutiny. Brief for Am. Civil Liberties Union *et al.* as

**B.      Maine's law is not viewpoint discriminatory.**

Unlike the law at issue in *Sorrell*, Maine's law regulates the commercial exchange of data to serve customers' interests in privacy, not in order to suppress a particular message. This is apparent from both the text and the legislative history of the law.

Maine's law ensures that customers decide whether and when their data may be used for any purpose beyond the provision of internet access. This is the essence of a commercial privacy regulation. The law does not single out for regulation potentially expressive uses of customer data; it merely requires ISPs to act in accordance with the legitimate expectations of privacy that customers have in the data they have no choice but to share. *Cf. United States Telecom Ass'n v. Fed. Commc'ns Comm'n*, 855 F.3d 381, 388 (D.C. Cir. 2017) (upholding FCC's net neutrality rules against First Amendment challenge; noting the rules simply "require[] ISPs "act in accordance with customers' legitimate expectations"); *Sorrell*, 564 U.S. at 573 (noting that "private decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge" (citing *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728 (1970))).

The law's opt-in requirement is subject to a small number of exceptions, but these exceptions are not viewpoint discriminatory and are consonant with the state's goal of protecting consumer privacy. The exceptions to the opt-in requirement fall into three categories of uses of customer data: (1) uses incident to the provision of internet access, Me. Rev. Stat. tit. 35-A, § 9301(4)(A)–(B), (D)–(E); (2) uses for emergency health and safety services, *id.* § 9301(4)(F); and (3) uses necessary to comply with legal process, *id.* § 9301(4)(C). Within the first category is an exception for "advertis[ing] or market[ing] the provider's communications-related services to

---

Amici Curiae in Support of Defendant's Opp. to Judgment on the Pleadings, *ACA Connects v. Frey*, No. 1:20-cv-00055-LEW (D. Me. 2020). We concur with the ACLU and EFF that the law would survive review even under *Central Hudson*.

the customer." § 9301(4)(B). The plaintiffs in this case argue that this exception draws "unreasonable distinctions between closely related types of speech"—that is, between advertising for communications-related and for non-communications-related services, Pl. Br. 2; *id.* 7—but the exception is consistent with the law's limitation on the use of customer data to the provision of internet service.[9] The law is thus distinguishable from the one at issue in *Sorrell*, under which pharmacies could share prescriber-identifying information with anyone except drug manufacturers for any purpose except marketing. 564 U.S. at 572. Unlike the law there, Maine's opt-in and opt-out regime does not give customers a "contrived choice" between agreeing to use of their data "without constraint" and use of data "by those speakers whose message the State supports." *Cf. id.* at 574.

Nor is there anything in the law's legislative history that suggests an intent to target a particular viewpoint. Again, this distinguishes the case from *Sorrell*, in which the Court determined that Vermont's formal legislative findings confirmed that the law was aimed at a particular viewpoint. *Cf. id.* at 565.

### Conclusion

For the foregoing reasons, Maine's law does not warrant heightened scrutiny, and the court should uphold it as a reasonable effort to safeguard personal privacy.

---

[9] FTC, *Protecting Consumer Privacy in an Era of Rapid Change: Recommendations for Businesses and Policymakers*, 38–39 (2012), https://perma.cc/6HNE-9L7S (explaining that customers expect further solicitation of business related directly to the original transaction); Pew Research Center, *Privacy and Information Sharing*, 6, 24–25 (2016), https://perma.cc/BL4K-7U4X (similar).

June 1, 2020                                    Respectfully submitted,

/s/  Richard L. O'Meara                         /s/  Ramya Krishnan
Richard L. O' Meara, Bar No. 3510               Ramya Krishnan*
Murray, Plumb & Murray                          Leena Charlton*
75 Pearl Street, P.O. Box 9785                  Alex Abdo*
Portland, ME 04104-5085                         Jameel Jaffer*
(207) 773-5651                                  Knight First Amendment Institute
romeara@mpmlaw.com                                at Columbia University
                                                475 Riverside Drive, Suite 302
                                                New York, NY 10115
                                                (646) 745-8500
                                                ramya.krishnan@knightcolumbia.org

                                                *pro hac vice certification forthcoming

                                                Counsel for Amicus Curiae