UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| ACA CONNECTS – AMERICA's COMMUNICATIONS ASSOCIATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-cv-00055-LEW |
| AARON FREY, in his official capacity As Attorney General of the State of Maine, | ) ) ) ) | |
| Defendant. | ) ) | |

## <u>ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY</u>

In 2019, Maine enacted its Act to Protect the Privacy of Online Customer Information, L.D. 946, amending Maine telecommunications law to establish privacy requirements for broadband Internet access service providers operating in Maine and providing Internet access to customers who are both located and billed for service in Maine. 35-A M.R.S. § 9301. The Plaintiffs in this action—ACA Connects, CTIA, NCTA, and USTelecom, a group of trade associations—contend that the new Act violates the United States Constitution because it deprives their members of the First Amendment right to share information in their possession, imposes speaker-based and content-based speech restrictions, and includes speech-related restrictions that are unconstitutionally vague.

The matter is before the Court on a trio of motions challenging the admissibility of expert opinions.

**BACKGROUND**

**Chapter 94**

The challenged privacy statute is codified in Chapter 94 of Maine Revised Statutes Title 35-A, and consists of a solitary section addressed to the "[p]rivacy of broadband Internet access service customer personal information." 35-A M.R.S. § 9301. In Chapter 94, the Maine Legislature defined personal information to include two categories, one involving personal identifiers and the other involving usage data, as follows:

(1) Personally identifying information about a customer, including but not limited to the customer's name, billing information, social security number, billing address and demographic data; and

(2) Information from a customer's use of broadband Internet access service, including but not limited to:

(a) The customer's web browsing history;

(b) The customer's application usage history;

(c) The customer's precise geolocation information;

(d) The customer's financial information;

(e) The customer's health information;

(f) Information pertaining to the customer's children;

(g) The customer's device identifier, such as a media access control address, international mobile equipment identity or Internet protocol address;

(h) The content of the customer's communications; and

(i) The origin and destination Internet protocol addresses.

*Id.* § 9301(1)(C).

Chapter 94 protects both categories of personal information equally. Chapter 94 prohibits broadband Internet service providers ("ISPs") from using, disclosing, selling, or permitting access to the personal information of Maine customers absent the customer's "express, affirmative consent," *id.* § 9301(2), (3)(A), subject to certain limited exceptions.[1] Chapter 94 protects not only customer personal information, but also information that does not come within Chapter 94's definition of personal information. It does so by providing that any information that is not personal information may not be used, disclosed, sold, or shared if the customer provides written notice "that the customer does not permit the provider" to do so. *Id.* § 9301(3)(C). In effect, Chapter 94 requires a customer to opt in before ISPs may share the customer's personal information and empowers the customer to opt out to prevent ISPs from sharing, essentially, any other information the ISP has collected on the customer. Finally, Chapter 94 prohibits ISPs from refusing service, affording financial incentives, or imposing financial disincentives related to the customer's privacy elections. *Id.* § 9301(3)(B).

## *Central Hudson* Standard

The core question in this case is whether Chapter 94 exceeds the authority of the State of Maine to regulate commercial speech. All of the expert testimony challenged in the pending motions is meant to address that core question in some fashion. Consequently, the legal standard that informs the states' authority to regulate commercial speech is itself

---

[1] Exceptions permit law enforcement access under the Stored Communications Act, 18 U.S.C. § 2703, and its Maine analogues found in 16 M.R.S. §§ 641 – 650-B. In addition, an ISP is permitted to use customer information, including personal information, in connection with the provision and advertisement of its own services, in response to a court order, for billing purposes, to prevent fraud, and to facilitate third-party emergency services. *See* 35-A M.R.S. § 9301(2), (4).

relevant background for the motions to exclude expert testimony. For that reason, I outline the standard before relating the substance of the experts' challenged opinions.

Where a law imposes restrictions on lawful commercial speech, the restriction must serve a substantial interest and be narrowly drawn. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563-65 (1980). A narrowly drawn regulation is one that is proportional to the interest at stake, without restricting speech more widely than necessary or in a manner ineffectual to the interest in question. *Id.* at 564-65. Thus, a state "cannot regulate speech that poses no danger to the asserted state interest"; "nor can it completely suppress information when narrow restrictions on expression would serve its interest as well." *Id.* at 565.

To resolve the parties' First Amendment controversy, the Court must initially "determine whether the expression is protected by the First Amendment"[2]; then evaluate the substantiality of the "asserted governmental interest." *Id.* 566. Assuming the expression is protected and the governmental interest is substantial, the Court must then assess "whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*

## The Experts

### *Professor Jordan*

Scott Jordan, Ph.D., is a professor of computer science at the University of California, Irvine. His advanced degrees are in Electrical Engineering and Computer

---

[2] For present purposes, the parties appear to agree that consumer privacy is a substantial state interest, though they have not addressed whether trade in "personal information" is necessarily lawful if a state or the federal government legislates otherwise.

Science. He served as Chief Technologist of the Federal Communications Commission in 2014 through 2016, with project experience including privacy regulation. Attorney General Frey has retained Professor Jordan to testify as an expert witness to help substantiate the privacy concerns that animate Chapter 94. Drawing from his expert report, the topics that Professor Jordan might address include personal identifiers, privacy concerns related to information other than personal identifiers, the kinds of information available to and collected by ISPs, the uses to which such information can be put, and differences in data collection as practiced by ISPs and edge providers. Expert Report of Professor Scott Jordan (ECF No. 86-1).

Plaintiffs request an order excluding Professor Jordan's opinion that "[t]argeted regulation" of ISPs "is consistent with [both] the distinctive role that ISPs play" and ISPs' "access to a uniquely broad set of information about their consumers." *Id.* at 2. They also want an order excluding his opinion that Chapter 94 "falls squarely within the range of privacy laws in the field." *Id.* at 4.  See Pls.' Mot. to Exclude (ECF No. 86) at 1-3, 7-20.

*Professor Yoo*

Christopher S. Yoo, J.D., M.B.A., is a professor of law at the University of Pennsylvania, where he teaches courses on, *inter alia*, Internet Law, Telecommunications Law, and Privacy. Professor Yoo has extensively studied, and has publicly commented on, several topics associated with Internet regulation, including the FCC's abandoned effort to regulate ISPs. He is a past member of the American Law Institute, where he advised on matters associated with Data Privacy. Plaintiffs have retained Professor Yoo to opine on Maine's decision to focus its privacy regulation on ISPs. Specifically,  Professor Yoo plans

to convey the idea that the Maine Legislature's approach is an outlier due to its failure to appreciate that edge providers and other businesses on the Internet present comparable or greater risks for Maine citizens, and its failure to adopt a less burdensome opt-in and opt-out protocol recognized by federal agencies and other states.  Professor Yoo also suggests that Chapter 94 should include more exceptions to privacy protection and permit financial incentives in exchange for consent because those are prevailing approaches adopted elsewhere. Expert Report of Professor Christopher S. Yoo (ECF No. 87-1).

Defendant requests an order excluding Professor Yoo's opinions, explaining that while he may be an expert on privacy law, Plaintiffs have retained him simply to rearticulate Plaintiffs' legal arguments in testimonial form. See Def.'s Mot. to Exclude Opinion Testimony of Christopher S. Yoo (ECF No. 87). They characterize Professor Yoo's report and anticipated testimony as an amicus brief delivered by an expert witness. *Id.* at 8-9.

### *Professor Towvim*

Professor Adam Towvim, M.B.A., is an independent consultant specializing in "data/privacy/monetization." Expert Report of Professor Adam Towvim (ECF No. 92), Appendix A.[3]  Plaintiffs have retained Professor Towvim to opine that ISPs "do not play a unique role in the collection, use, or sharing of consumer data that warrants unique regulatory burdens." *Id.* at 2. Based on his industry insight, he states that ISPs are "small players" in the digital advertising industry and that other online entities pose "far greater

---

[3] Mr. Towvim is an adjunct professor at Brandeis University's International Business School, where he teaches "courses at the intersection of marketing, advertising, and data analytics." Towvim Report at 1.

risks to consumer privacy than do ISPs," such that Chapter 94 "will not meaningfully advance Maine's purported interest in protecting consumer privacy." *Id.*

Defendant requests an order excluding Professor Towvim's opinions because he professes expertise in advertising technology and this area of expertise is not helpful or fitted to resolution of the issues before the Court. Def.'s Mot. to Exclude Opinion Testimony of Adam C. Towvim (ECF No. 88).

## DISCUSSION

### *Standard*

The Federal Rules of Civil Procedure and the Federal Rules of Evidence permit an expert to testify in the form of an opinion provided that, among other things, all opinions and their bases are disclosed in advance through an expert designation and expert report, Fed. R. Civ. P. 26, and provided that certain requirements are established by the party who designates the expert, Fed. R. Evid. 702; *Martinez v. United States*, 33 F.4th 20, 23-24 (1st Cir. 2022). Here, the parties do not quibble about the disclosure or designation requirements of Rule 26 but instead argue that certain requirements of Rule 702 cannot be met.

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Since the Rules' adoption in 1972, it has been understood that the admissibility of expert opinion testimony is primarily a question of utility. *See* Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier."). Rule 702's itemized standards were added in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Charmichael*, 526 U.S. 137 (1999), and their progeny, to supply the trial court with a non-exclusive set of standards to safeguard against the admission of unreliable or unhelpful opinions. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments.

Importantly, "Rule 702 has been interpreted liberally in favor of the admission of expert testimony," *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006). For example, an expert's opinion may be useful to a finder of fact even when it is not generally accepted by experts in the field, *Daubert*, 509 U.S. at 589, so long as the opinion has "a reliable basis in the knowledge and experience of [the expert's] discipline, *id.* at 592. Provided that an expert's knowledge and experience (or skill, training, or education) are equal to the task, the expert "need not have had first-hand dealings with the precise type of event that is as issue" to be able to provide useful guidance to the fact finder. *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004). Furthermore, weaknesses in the factual underpinnings of an opinion do not dictate exclusion; issues of weight and credibility generally are matters for the fact finder's consideration, unless it is apparent that the opinion is tethered to the facts only by the say so of the expert. *Gen. Elec. Co. v. Joiner*,

522 U.S. 136, 146 (1997).

Finally, in a bench trial, "where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006); *Warford v. Indus. Power Sys.*, *Inc.*, 553 F. Supp. 2d 28, 31 (D.N.H. 2008).

### *Analysis*

"It's a jungle out there." Randy Newman (2003)

### A.     **Plaintiffs' Motion to Exclude Scott Jordan as Expert Witness**

Plaintiffs seek to exclude Professor Jordan's opinions (1) that it is sensible for privacy regulation to single out ISPs for special treatment and (2) that Chapter 94 is not a bizarre outlier regulation but sits comfortably within the emerging tableau of privacy regulation. I find that the exclusion of these opinions is not warranted.

As to the former opinion, I do not agree with Plaintiffs that Professor Jordan must have first-hand knowledge of ISPs' actual practices in order to opine that the information they have access to raises privacy concerns. At best this objection goes to weight. Similarly, Plaintiffs' contention that Professor Jordan must acknowledge the relative privacy risk associated with various other actors in the wider Internet realm before offering an opinion about the reasonableness of protecting personal information collected by ISPs is an issue of weight. A state might want to regulate privacy concerns associated with local Internet on-ramps even if it lacks the knowledge, concern, or wherewithal to regulate privacy concerns associated with the entire menagerie of providers existing across all online

platforms, including those that arguably present the greatest threat to consumer personal information. I understand that Plaintiffs contend that such an approach is irrational, but nonetheless that is a factual, or perhaps mixed, issue I must decide. Given his education, training, and experience, Professor Jordan appears to have useful insights to offer on the issue. Finally, on the issue of qualifications, the fact that Professor Jordan is not an expert in online advertising[4] does not prevent him from offering opinions within the scope of his expertise.

As to Professor Jordan's opinion that Chapter 94 is not an irrational or extreme approach to online privacy regulation as compared to other approaches, Plaintiffs' challenges once again go to weight rather than admissibility. States are, historically, laboratories of innovation. The fact that Plaintiffs can identify other states that cast a privacy net wider in application but less restrictive of information—which states' privacy regimes Professor Jordan has not analyzed—may demonstrate that Professor Jordan's opinion[5] is undeserving of the most weight, but Defendant has persuaded me that his opinion is informed by relevant expertise.

---

[4] According to Plaintiffs, "a central question under the *Central Hudson* framework is whether the collection and use of consumer information for targeted advertising presents a risk to consumer privacy and, if so, whether ISPs pose a unique risk." Pls.' Mot. to Exclude at 16. The initial question posed in this assertion may blink reality based on public reaction and widespread governmental concern, unless unelected judges are now policy tsars. The second question may prove misleading, given its assumption that a risk must be unique to deserve focused regulatory attention. Now is not the time to resolve such questions, essentially siding with one side or the other based on an early perusal of competing expert reports.

[5] Defendant has advised that this particular opinion is meant to rebut the opinion of Professor Yoo that Chapter 94 is unprecedented. Professor Jordan's regulatory experience warrants a finding that Plaintiffs' challenge goes to weight rather than admissibility.

**B.      Defendant's Motion to Exclude Opinion Testimony of Christopher Yoo**

By all appearances, Plaintiffs are offering Professor Yoo as an expert on privacy law, generally, and on the proper application of the *Central Hudson* standard to this case, more specifically. They also appear to offer Professor Yoo as a privacy policy expert on the assumption that it is the role of this Court to premise its eventual ruling on an independent policy evaluation about what reasonable privacy regulation looks like. *See* Expert Report of Professor Christopher S. Yoo at 1 ("[A]pproaches taken by . . . other regimes represent more reasonable balances of costs and benefits and are better tailored to protecting consumer privacy than the approach taken by Maine.").

With rare exceptions, legal questions are "exclusively the domain of the judge" and "expert testimony on . . . purely legal issues is rarely admissible." *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997). I am not interested in hearing Professor Yoo restate, in narrative form, the privacy laws of the land in order to shepherd my constitutional inquiry; Plaintiffs' attorneys ought to be able to highlight the salient details through legal briefing.

However, rather than foreclosing Professor Yoo's testimony, I reserve judgment on the motion to exclude. It may prove helpful to understand the variety of tools available in the regulatory toolbox, so that I can better assess whether Chapter 94 is a "narrowly drawn" regulation. Based on his report, it appears that Professor Yoo has expert insight in this area and therefore could provide expert testimony that is helpful to fact finding, without opining on ultimate issues of law.

**C.      Defendant's Motion to Exclude Opinion Testimony of Adam C. Towvim**

Plaintiffs retained Professor Towvim "to address whether ISPs' characteristics or business practices pose special risks to consumer privacy, such that ISPs materially differ from other businesses that also collect, use, and share consumer data." Expert Report of Professor Adam Towvim at 2. Professor Towvim's opinion is that ISPs do not have "special access to data" and do not play a role that would justify "unique regulatory burdens." *Id.* Factors that inform his opinion include the growing use of encryption and virtual private networks, which tends to hamper ISPs' ability to access information, and the dominance of other players in the online marketplace when it comes to collecting and monetizing personal information. Given the existence of much greater risks to privacy in the online ecosystem—the advancement of said risks being Professor Towvim's primary area of expertise—he opines that Chapter 94 "has fundamentally mismatched the law's asserted objective with the marketplace realities of how the advertising ecosystem collects and uses consumer data." *Id.* at 29.

Defendant seeks to exclude Professor Towvim's testimony because he is an advertising technology strategist and lacks appreciable knowledge of ISP data collection capabilities and practices, lacks any relevant regulatory or policy insight, and could not articulate any meaningful expert methodology at his deposition. In opposition, and succinctly restated, Plaintiffs explain that Professor Towvim's considerable experience in the field of advertising technology is relevant insofar as the primary anticipated use of the consumer information protected by Chapter 94 is to monetize consumer information through "third-party digital advertising." Pls.' Opp'n (ECF No. 91) at 1.

Several of the more strident assertions found in Professor Towvim's report certainly give me pause, particularly in regard to the question of fit.  Still, it may prove necessary to consider the larger ecosystem given that relevance is an expansive concept and the *Central Hudson* framework is rather free ranging in its own right. *See*, *e.g.*, *Central Hudson*, 447 U.S. at 589 (Rehnquist, J., dissenting). Through experience, Professor Towvim has gained specialized insight when it comes to the means and methods of collecting, trading, and monetizing the personal information of Internet traffic after end users travel beyond the confines of their respective ISPs. And because I am both the gatekeeper and the factfinder, I remain free to exclude or disregard Professor Towvim's testimonial transgressions if Plaintiffs attempt to have him stray too far afield. Consequently, as I did with the motion to exclude Professor Yoo's opinions, I reserve judgment on the motion to exclude Professor Towvim's opinions.

## CONCLUSION

Plaintiffs' Motion to Exclude Scott Jordan as Expert Witness (ECF No. 86) is DENIED. Defendant's Motion to Exclude Opinion Testimony of Christopher S. Yoo (ECF No. 87) is RESERVED. Defendant's Motion to Exclude Opinion Testimony of Adam C. Towvim (ECF No. 88) is RESERVED.

**SO ORDERED.**

Dated this 18th day of August, 2022.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE